**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 1 0 2024

TAMMY H. DOWNS, CLERK
By: _____
DEP CLERK

MARIA ELENA BARAJAS, Personal
Representative of the Estate of
DANIEL ADRIAN BARAJAS, deceased,

       Plaintiff,

v.

SALINE COUNTY, ARKANSAS,
a body politic,
HUNTER THOMPSON, Individually,
SULLIVAN SULZBERGER, Individually,
CHRISTY BIDDLE, Individually,
KATE HAWTHORN, Individually,
HARLEY SOWELL, Individually,
JAKE SCOGGINS, Individually,
JOEY SHAMLIN, Individually,
RODNEY WRIGHT, Individually,
CHRIS A. JARVIS, Individually,
TIM BRAGG, Individually,
R. ALLYN WEST, Individually,
KEVIN CLEGHORN, Individually,
JAY MCALISTER, Individually,
CHEEMA CARRIERS CORP., a Canadian
Corporation, and
MOHAMMED MERCHANT,

       Defendants.

Case No. 4:24CV318-JM

***JURY TRIAL DEMANDED*

This case assigned to District Judge _Brady_
and to Magistrate Judge _Harris_

## COMPLAINT

NOW COMES, Plaintiff, MARIA ELENA BARAJAS, Personal Representative of the

Estate of DANIEL ADRIAN BARAJAS, deceased ("PLAINTIFF"), by and through her attorneys,

LAUX LAW GROUP, and for her cause of action against Defendants, SALINE COUNTY,

ARKANSAS, a body politic, HUNTER THOMPSON, SULLIVAN SULZBERGER, CHRISTY

BIDDLE, KATE HAWTHORN, HARLEY SOWELL, JAKE SCOGGINS, JOEY SHAMLIN,

RODNEY WRIGHT, CHRIS A. JARVIS, TIM BRAGG, R. ALLYN WEST, KEVIN

CLEGHORN, JAY MCALISTER, CHEEMA CARRIERS CORP., a Canadian Corporation and MOHAMMED MERCHANT ("DEFENDANTS"), states as follows:

## JURISDICTION AND VENUE

1.      This federal action—based on the death of PLAINTIFF's adult son, DANIEL BARAJAS ("DANIEL")—arises under the United States Constitution, particularly under the Fourth and Fourteenth Amendments, and under law, particularly the Civil Rights Act of 1871, 42 U.S.C. § 1983 and Arkansas state law. This Honorable Court has jurisdiction by virtue of 28 U.S.C. §§ 1331 and 1367. Venue is founded in this Court upon 28 U.S.C. § 1391 as the acts of which Plaintiffs complain arose in this District.

2.      On or about June 10, 2022, PLAINTIFF was appointed the administrator of DANIEL's probate estate. See June 10, 2022 Bernalillo County (New Mexico) Probate Court Letters of Administration, *In the Matter of the Estate of Daniel Adrian Barajas, deceased*, Probate Case No. 2022-0717, attached hereto as Exhibit A.

3.      This action is re-filed, with the current pleading, pursuant to the Arkansas "savings statute," Ark. Code Ann. § 16-56-126. This action was previously pending in federal court in the Eastern District of Arkansas, as *Barajas v. Thompson, et al.,* Case No. 4:23-CV-760-JM.

## PARTIES

4.      At all relevant times, DANIEL was a United States citizen and was, therefore, entitled to all legal and constitutional rights afforded U.S. citizens. At all relevant times, DANIEL was of Latino heritage, insofar as his biological mother, PLAINTIFF, and his biological father, Jorge Barajas Sr., ("Jorge Sr.") each are of Latino heritage. DANIEL was killed in the State of Arkansas on January 15, 2022. PLAINTIFF is the court-appointed administrator of DANIEL's estate. See Exhibit A.

2

5.      DANIEL's heirs-at-law, namely, his biological parents (PLAINTIFF and Jorge Sr.) and his adult siblings, Jorge Barajas Jr., Raquel Ramos ("Raquel") and Xexilia Barajas ("Xexilia"), are all U.S. citizens. Therefore, DANIEL's heirs-at-law are entitled to all legal and constitutional rights afforded U.S. citizens. PLAINTIFF brings this action on behalf of DANIEL's estate and on behalf of DANIEL's heirs-at-law above, including herself.

6.      On January 15, 2022, and at all relevant times, Defendant, SALINE COUNTY, ARKANSAS (hereafter "SALINE CO.") was a governmental entity, a county, situated in the State of Arkansas, as defined by Ark. Code Ann. § 14-14-102.  At all relevant times, pursuant to the Arkansas Constitution, Amendment 55(4), SALINE CO. had the power to fix the number and compensation of deputies and county employees.  At all relevant times, SALINE CO. was located in the State of Arkansas, and was the employer—through the Saline County Sheriff's Office ("SCSO")—of the individually named deputies.  At all relevant times, the SCSO was a subdivision within the municipality which is SALINE CO.

7.      On January 15, 2022, and at all relevant times, HUNTER THOMPSON ("THOMPSON"), SULLIVAN SULZBERGER ("SULZBERGER"), CHRISTY BIDDLE ("BIDDLE"), KATE HAWTHORN ("HAWTHORN"), HARLEY SOWELL ("SOWELL"), JAKE SCOGGINS ("SCOGGINS") and JOE SHAMLIN ("SHAMLIN") (collectively "DEFENDANT DEPUTIES") each were employed by SALINE CO., occupying various departmental ranks from deputy through captain.

8.      As law enforcement officers, DEFENDANT DEPUTIES each had a duty to protect individuals placed in his or her custody and, moreover, had a duty not to affirmatively make individuals they encounter in the field less safe than before the encounter.  On January 15, 2022,

3

and at all relevant times, each of the DEFENDANT DEPUTIES acted under the color of state law and within the scope of his or her employment.

9.　　On January 15, 2022, and at all relevant times, RODNEY WRIGHT ("WRIGHT") was the SCSO sheriff.  As SCSO sheriff, WRIGHT was responsible for ensuring that all traffic stops by SCSO deputies—including DEFENDANT DEPUTIES—are performed within the limitations of the U.S. Constitution, regardless of any individual's race, ethnicity or nationality.

10.　　As SCSO sheriff, WRIGHT was SALINE CO.'s final policymaker in creating, implementing and maintaining all policies governing the conduct and discipline of SCSO deputies. On January 15, 2022, and at all relevant times, WRIGHT acted under the color of state law and within the scope of his employment.

11.　　On January 15, 2022, and at all relevant times, CHRIS A. JARVIS ("JARVIS") and TIM BRAGG ("BRAGG") were members of the Turtle Creek Fire Department, a volunteer district agency, located at 5900 Hwy 67, Benton, AR 72015.  On January 22, 2022, and at all relevant times, JARVIS and BRAGG were Volunteer Fire District Board Members in the State of Arkansas.

12.　　On January 15, 2022, and at all relevant times, R. ALLYN WEST ("WEST") and KEVIN CLEGHORN ("CLEGHORN") (collectively "DEFENDANT CORONERS") were employed by SALINE CO. occupying the positions of deputy county coroner and county coroner, respectively.  In Arkansas, an individual with no medical knowledge, anatomical training or any official certification is nonetheless qualified to run for the office of county coroner.  All that is required of a candidate is that he or she reach the age of majority (18) and not be a convicted felon.

13.　　As SALINE CO. coroners, DEFENDANT CORONERS were charged with several official responsibilities, such as determining an individual's manner and cause of death, which includes gathering and reviewing all reasonably available information on the deceased, including

4

but not limited to, medical information and other personal information pertinent to determining the manner and cause of death. See Ark. Code Ann. § 14-15-301.

14.    When a death is reported to DEFENDANT CORONERS, their official responsibilities include conducting a fair and competent investigation of the physical scene of the place of death, examining the deceased's body and taking it into custody, notifying the deceased's next-of-kin and issuing a death certificate. On January 15, 2022, and at all relevant times, each of the DEFENDANT CORONERS were acting under the color of state law and within the scope of his employment.

15.    At all relevant times, SALINE CO. was empowered, funded and directed to pay any § 1983 civil rights or intentional tort judgment for compensatory damages, actual damages and attorney fees, if applicable, for which SALINE CO. employees acting within the scope of their employment is found liable. SALINE CO. has the authority to provide for the indemnification of SALINE CO. employees accused of civil rights violations and intentional torts committed within the scope of their employment, and its common practice was to authorize indemnification for such employees. Accordingly, SALINE CO. is an indemnification party regarding the acts and/or omissions of which PLAINTIFF complains.

16.    On June 1, 2020, and at all relevant times, JAY MCALISTER ("MCALISTER") was employed by the State of Arkansas as an ASP trooper at the rank of Seargent and was acting under the color of state law, within the scope of his employment. On January 15, 2022, MCALISTER was the ASP supervisor on the scene of DANIEL's death and, at all relevant times, it was MCALISTER's duty to investigate DANIEL's death.

17.    On January 15, 2022, and at all relevant times, CHEEMA CARRIERS CORP. ("CHEEMA CARRIERS") was a foreign corporation conducting business in the County of Saline,

5

State of Arkansas.   CHEEMA CARRIERS CORP. headquarters is in Mississauga, Ontario, Canada.   On January 15, 2022, and at all relevant times, CHEEMA CARRIERS owned, maintained, managed, controlled and/or operated a Freightliner semi-tractor trailer (VIN 1FUJHHDR4LLKS3741).   CHEEMA CARRIERS is a non-resident of the United States.

18.     On January 15, 2022, and at all relevant times, MOHAMMED MERCHANT was acting as an employee, servant and/or agent of CHEEMA CARRIERS, and was responsible for inspecting and operating the aforementioned Freightliner truck (VIN 1FUJHHDR4LLKS3741). Upon information and belief, at all relevant times, MERCHANT was a citizen of Canada and a non-resident of the United States.

19.     Arkansas' long arm statute confers jurisdiction to the fullest constitutional extent and, thus, personal jurisdiction will attach to a non-resident defendant so long as it comports with due process. *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1073 (8th Cir. 2004).   Due process requires minimum contacts between a non-resident defendant and the forum state such that maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Burlington Indus., Inc. v. Maples Indus.*, Inc., 97 F.3d 1100, 1102 (8th Cir. 1996).

20.     The Supreme Court has set forth two theories for evaluating minimum contacts: general jurisdiction; and specific jurisdiction. *Dever*, 380 F.3d at 1073.   Specific jurisdiction is viable only if the injury giving rise to the lawsuit occurred within or had some connection to the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S. Ct. 1868 (1984).

21.     Because CHEEMA CARRIERS, by and through their employee, servant and/or agent, MERCHANT, engaged in negligent conduct which had a strong connection to Arkansas, the forum state, this Court has personal jurisdiction over CHEEMA CARRIERS and MERCHANT.

22.     On or about December 9, 2022, CHEEMA CARRIERS received correspondence alerting it to the investigation of DANIEL's death and CHEEMA CARRIERS' duty to preserve any and all evidence related to the incident pending litigation.

## FACTUAL ALLEGATIONS

### A Fatal Pedestrian-MVA on Interstate 30 in Malvern (Saline Co.), Arkansas in the Early Morning of January 15, 2022

23.     On Saturday, January 15, 2022, at approximately 5:57 am, Regis Crenshaw drove eastbound on I-30 in Saline County, Arkansas. He was headed toward the 106 mile marker of the two-lane highway and driving within the posted 75 mph speed limit. There are no roadway lights along this portion of I-30, and the conditions that early morning were dark[1] and rainy, and the wet roads were slick.

24.     Driving in the righthand lane, Mr. Crenshaw approached the marker when, up ahead, to his right, he suddenly observed a man covered with a blanket emerge on foot from darkness and enter the highway. Mr. Crenshaw quickly hit his brakes but he nonetheless struck the blanketed man, causing him to tumble onto the interstate.

25.     In an effort to help the man, Mr. Crenshaw pulled over and quickly exited his car. As he rushed toward the man—who was now on his hands and knees in the lefthand lane—Mr. Crenshaw saw the man look up and raise his right arm in front of his face as though to shield himself.

26.     A moment later, to his horrific dismay, Mr. Crenshaw observed a truck driven by MERCHANT run over the man, killing him.

---

[1] Sunrise in Saline County, Arkansas on January 15, 2022 was approximately 7:17 am.

27.     That man was 38-year-old son, brother and uncle, DANIEL BARAJAS.  See Image No. 1 below.



**Image No. 1: Daniel Adrian Barajas, born August 3, 1983**

The Early Morning of January 15, 2022, Less Than Two Hours Before DANIEL's Death

28.     Less than two hours before his death, DANIEL drove westbound on his way to Dallas, Texas to visit his sisters, Raquel and Xexilia.  DANIEL's travel route required accessing I-30 westbound in Little Rock, Arkansas.  DANIEL—a highly sought-after specialty welder with considerable highway traveling experience—was very excited to see his family.

29.     DANIEL's journey had him traveling westbound from Kentucky to Little Rock, where he took I-30 westbound directly to Dallas.  I-30 is a 367 mile-long Interstate Highway in Texas and Arkansas.  I-30 travels from I-20 west of Fort Worth, northeast via Dallas, and Texarkana, through Saline County to I-40 in North Little Rock.  See Image No. 2 below.



**Image No. 2: Map of Interstate 30 spanning the States of Arkansas and Texas**

8

30.     Because he frequently traveled as a result of his work as a specialty welder, DANIEL kept many personal and professional items in his vehicle, a white 2005 Nissan Xterra SUV bearing State of New Mexico LPN ASZC78.  For instance, inside DANIEL's SUV on January 15, 2022 was his Transportation Worker Identification Credential (TWIC) which he used to access various national federal worksites across the country where he did welding jobs.  See Image Nos. 3 and 4 below.



**Image No. 3: DANIEL's TWIC card**



**Image No. 4: DANIEL at a work site**

31.     The Maritime Transportation Security Act requires a TWIC for workers who need unescorted access to secure areas of the nation's security-regulated maritime facilities and vessels. Each TWIC applicant undergoes a security threat assessment to determine a person's eligibility. The assessment considers criminal convictions, arrest warrants and indictments.  The issued card contains an integrated circuit computer chip, which stores the cardholder's information and biometric data.

32.     Based on the issuance of his current TWIC—which DANIEL kept in his SUV—it was clear that by January 15, 2022, DANIEL had passed any and all requisite security threat

9

assessments and was allowed access to secure areas of the nation's security-regulated maritime facilities and vessels through at least February 2026.

33.    Also in DANIEL's SUV on January 15, 2022 was a medical record: a two-page "Visit Summary" from Eye Associates of New Mexico relating to a 2021 eye appointment.  As reflected in the summary's clinical notes, DANIEL was diagnosed with multiple eye conditions, including bilateral irregular astigmatism of eyes, chronic allergic conjunctivitis and unstable keratoconus in 2021. See Image No. 5 below.



Clinical Problems List
**Problem Description**
Bilateral irregular astigmatism of eyes
Chronic allergic conjunctivitis
Unstable keratoconus
Abnormal finding on evaluation procedure
Irregular astigmatism
Keratoconus, stable condition
Regular astigmatism

**Image No. 5: DANIEL's Eye Associates of NM visit summary excerpt 2021**

34.    According to the American Academy of Ophthalmology, conjunctivitis is inflammation of the conjunctiva from infection or allergies which causes one's eyes to be red, swollen, itchy and watery, and sometimes with sticky discharge.  Chronic allergic conjunctivitis—from which DANIEL suffered in January 2022—results in eye irritation and can also cause one's eyelids to be puffy.

35.    At all relevant times, as reflected in medical documentation inside DANIEL's SUV, DANIEL also suffered from Pellucid Marginal Degeneration (PMD), a serious and slowly progressing variant of the eye disease, keratoconus, with which he was also diagnosed in 2021. See Image No. 6 below.

| Impression Plan | Keratoconus, unstable, bilateral H18.623    consistent with Pellucid Marginal Degeneration |
| | Recommend a newly designed pair of Scleral contact lenses to improve fit and acuity, OU. |
| | Scleral contact lenses are medically necessary for daily function |
| RTC | Return in 1 Year for Complete exam |
| Impression Plan | Other chronic allergic conjunctivitis H10.45 |
| | Allergies account for some degree of irritation. Try artifical tears 4 times a day. Recommend patient try over the counter allergy drops: Zaditor or Alaway 2 times a day as needed. If still not better, patient may have prescription for Pataday, Bepreve, or Lastacaft. |

**Image No. 6: DANIEL's ophthalmological diagnoses excerpt 2021**

36.     PMD is an eye disease marked by peripheral corneal thinning that worsens over the course of one's lifetime and can cause severe deterioration in visual function. Light sensitivity, glare and halos are all common in individuals suffering from keratoconus, and bright lights at night may be particularly extreme or have a glow around them.

37.     In 2021, DANIEL was prescribed specialty contact lenses—scleral contact lenses—which are designed to accommodate a variety of eye conditions, including keratoconus. See Image No. 6 above. In September 2021, DANIEL's eye doctor, Dr. Walter Ramsey—a diseases of the eye contact lens specialist—prescribed specialty welder's goggles designed to accommodate DANIEL's eye conditions. See Image No. 7 below.



**Image No. 7: DANIEL's ophthalmologically prescribed welder goggles**

38.     On January 15, 2022, DANIEL kept the goggles depicted in Image No. 7 above in his SUV. Also in DANIEL's SUV and/or on her person on that date—along with his TWIC, eye

11

doctor papers and work goggles—was his wallet, his cell phone, car keys and a metal box containing approximately $2000.

<u>DANIEL Encounters DEFENDANT DEPUTIES on I-30 at Approximately 4:35 am</u>

39.     Unaccompanied, DANIEL drove westbound—in the direction of Dallas—on I-30 in Saline County the early morning hours of January 15, 2022, approximately 45 miles west of Little Rock before he encountered the DEFENDANT DEPUTIES.

40.     DANIEL lost his life on January 15, 2022 and, therefore, he cannot give his account of what happened on the highway that morning. The official reports written by the DEFENDANT DEPUTIES are the only record of what occurred. It is important at the outset to note that the DEFENDANT DEPUTIES wrote their reports after they knew DANIEL had died and, therefore, they knew that he could challenge or contradict their accounts during any subsequent investigation.

41.     Most of the DEFENDANT DEPUTIES drafted official reports purporting to memorialize the significant events that occurred during their interaction with DANIEL. It is important to note that all of the reports purporting to memorialize DANIEL's condition and demeanor were submitted after DANIEL's death and after the DEFENDANT DEPUTIES had an opportunity to discuss the contents of each other's reports.

42.     According to reports submitted, THOMPSON and SULZBERGER came upon a white Nissan Xterra—DANIEL's SUV—parked in the *middle* of the I-30 *eastbound* entrance ramp at the 106 mile marker at approximately 4:35 am.

43.     Both THOMPSON and SULZBERGER stated that DANIEL's SUV was parked in the "middle" of the "Eastbound" onramp. If accurate and truthful, that would mean not only that DANIEL's SUV was obstructing access to I-30 eastbound but also that it was facing *away* from his destination. See Image No. 8 below.

12



**Image No. 8: Approximate area on the 106 mile marker eastbound onramp to I-30, Saline Co., where DEFENDANT DEPUTIES claim DANIEL slept in his parked SUV**

44.     According to THOMPSON, DANIEL was asleep in his SUV. THOMPSON shined a spotlight at DANIEL's SUV and in his face. He says he awakened DANIEL and ordered him out of his vehicle. DANIEL complied.

45.     Once they made visual contact with DANIEL, THOMPSON and SULZBERGER immediately believed he was a drug trafficker. THOMPSON contacted their supervisor, HAWTHORN, seeking guidance on how to proceed. Referring to DANIEL's traffic stop as "the incident," HAWTHORN immediately contacted BIDDLE, a K-9 deputy, and requested she respond to the scene of "the incident" with her drug-sniffing dog, "Cain."

46.     Back at the 106 mile marker, according to THOMPSON, one of DANIEL's eyes was "very red." THOMPSON claims that DANIEL said that he was on his way to Kentucky but then started talking to his car, saying "we need to go." THOMPSON claims that DANIEL spoke as though he was talking to a non-existent person. According to THOMPSON, DANIEL was "not completely coherent with what was going on or where he was at."

13

47.     Around this time, THOMPSON ran DANIEL's identification and determined that DANIEL's record was totally clean, meaning he had no active criminal warrants, had violated no court orders and was not even flagged for an outstanding traffic ticket.

48.     According to SULZBERGER, around this time DANIEL "was not speaking," and SULZBERGER also "observed [DANIEL] shaking erratically and sweating profusely. [DANIEL]'s eyes were also very deep cherry red and swollen." SULZBERGER ordered DANIEL to sit on the ground and then frisked him.

49.     In contrast to THOMPSON's description of DANIEL which had him talking, SULZBERGER reported that he "could not get Daniel to explain where he had been or what he had been doing." SULZBERGER later stated that DANIEL "refused to answer or simply stated he did not know anything when asked where he was going, where he was coming from, how long had he been traveling, or who he may have been traveling with."

50.     According to SULZBERGER, DANIEL spoke in fragmented sentences and was unable to focus on questions. However, DANIEL did tell SULZBERGER that he was fine and that the only thing bothering him at that time were his contact lenses. DANIEL asked if he could get up from the ground because it was cold, and SULZBERGER ordered him to go sit or stand in front of THOMPSON's vehicle.

51.     According to SULZBERGER, DANIEL then began to stare at his SUV while talking in an argumentative tone toward no one and said, "I'm talking to her." SULZBERGER ordered DANIEL to step away from his SUV and go toward THOMPSON's vehicle. After that, according to SULZBERGER:

> Daniel then turned around to face me and began to walk back towards the patrol unit. *When Daniel was walking toward the unit he took a sharp turn towards the interstate and attempted to walk past where our patrol vehicles were covering the ramp, into traffic.*

14

> Deputy Thompson then exited his unit and we then took Daniel's
> arm and had him sit near the front of Deputy Thompson's unit
> (emphasis added).

52.     SULZBERGER referred to these alleged actions by DANIEL as a suicide attempt.

In his report, however, THOMPSON makes no mention of DANIEL attempting to walk into traffic

nor of having to escort DANIEL away from the highway with SULZBERGER.  THOMPSON

makes no mention of observing any suicide attempt by DANIEL.

53.     At 4:51 am, approximately sixteen (16) minutes after initial contact,

SULZBERGER called dispatch, requesting medical personnel come to the scene for a male subject

with possible hallucinations attempting to walk into traffic on I-30.

54.     As ordered by HAWTHORN, BIDDLE and her dog, Cain, arrived at the scene at

5:09 am, according to the report submitted by BIDDLE.   Unlike THOMPSON and

SULZBERGER, BIDDLE observed DANIEL's SUV "*partially parked* in the roadway" of the

ramp at the 106 mile marker and not in the *middle* of the ramp.  A SCSO deputy named

SCOGGINS arrived at the scene at the same time as BIDDLE.  BIDDLE started her K-9 search of

DANIEL's SUV at 5:17 am.  No drugs, weapons or contraband were detected or found in the

vehicle.

55.     About 30 minutes after receiving the call about DANIEL, HAWTHORN drove to

the scene to assist THOMPSON, SULZBERGER, BIDDLE and SCOGGINS and, while en route,

she notified SOWELL of "the incident," and SOWELL responded as well.  HAWTHORN and

SOWELL arrived at the 106 mile marker at the same time.

EMTs' Medical Assessment of DANIEL—January 15, 2022 from 5:14 am-5:50 am

56.     EMTs   with   Saline   Memorial   Hospital   received   SULZBERGER's   call:

"REQUESTING MEDICAL FOR MALE SUBJ. HAVING HALLUCINATIONS."  The EMTs

then proceeded to the scene at "Code 1" status. They arrived at the scene at 5:14 am and made contact with DANIEL.

57.     Due to the rain, the EMTs physically examined DANIEL inside their ambulance unit and gave him tests designed to assess cognition, perception and acuity. From these tests, the EMTs determined that DANIEL was perfectly alert and oriented times four (4), meaning he was properly aware of person, place, time and situation (4/4).

58.     Put another way, based on these medical tests, and despite THOMPSON's roadside opinion to the contrary, medical professionals found that DANIEL was completely coherent with what was going on and with where he was at.

59.     Starting at 5:34 am—while DANIEL was inside the ambulance being examined— DEFENDANT DEPUTIES performed a thorough interior vehicle search of his SUV, finding no drugs, weapons or contraband. DEFENDANT DEPUTIES reported that nothing was found during the search.

60.     Inside the ambulance, testing showed DANIEL was neurologically stable with normal patient acuity, and his Glascow Coma Scale score was perfect (15/15). EMTs noted that DANIEL presented with red eyes but this was due to recent issues with his contact lenses. They charted that his pupils were normal in size and properly reactive to light.

61.     DANIEL told the EMTs that there was "nothing wrong with him." In answer to their questions, he mentioned that he had hallucinated before when he was drinking alcohol but added that he had not consumed alcohol recently, and was not intoxicated.

62.     Despite SULZBERGER's communicated concerns about DANIEL's alleged suicide attempt, there is no mention of suicidal ideation nor suicide-related questioning in the EMS record or clinical notes: only SULZBERGER's subjective complaints to the EMTs.

16

63.     Consistent with the normal results of the tests and assessments on the scene, the

EMTs noted that DANIEL was "able to answer all questions." See Image No. 9 below.



**Image No. 9: DANIEL's 01/15/2022 Medtran EMS patient care record excerpt**

64.     Because he was cognitively sound and physically intact—as reflected in his EMT

chart and his normal test findings—DANIEL refused medical transport and declined any treatment

from the EMTs. Accordingly, at 5:50 am, after consulting with DEFENDANT DEPUTIES and

providing DANIEL with a blanket for warmth, the EMTs left the scene, leaving DANIEL "in the

custody of SCSO." See Image No. 9 above.

65.     According to THOMPSON and SULZBERGER, when DANIEL came out of the

ambulance at 5:50 am, he was no longer acting strange. According to them, DANIEL no longer

spoke to invisible people and was no longer shaking or moving back and forth. According to them,

based on the same cut-and-paste phrasing in their separate reports, "[t]he only other thing Daniel

stated to [them] before [they] left was that he may have been acting strange upon our first contact

because he has had minimal sleep and that he usually feels very strange when being woke up

suddenly."

66.     After the search of DANIEL's SUV exterior and interior, each of the

DEFENDANT DEPUTIES knew: 1) that DANIEL was currently TWIC security cleared; 2) that

DANIEL was gainfully employed; 3) that DANIEL had diagnosed medical conditions which

caused his eyes to be occasionally red and swollen; 4) that there were no drugs, weapons or

contraband in DANIEL's vehicle; 5) that there was no evidence of intoxication or alcohol consumption; and 6) that DANIEL was not the subject of any outstanding warrants.

67.     DANIEL had violated no law on January 15, 2022, before or after the arrival of DEFENDANT DEPUTIES.

68.     Despite a clean bill of mental and physical health by trained, qualified medical professionals, and despite the lack of legal basis to restrain his personal freedom or keep him in custody, THOMPSON told DANIEL he would not let him continue his drive to see his family "due to his mental state."

69.     THOMPSON refused to let DANIEL drive to Texas or to drive anywhere.

70.     THOMPSON's order to DANIEL not to drive is a meaningless directive if DANIEL is able to enter his vehicle, put the key in the ignition and drive away once DEFENDANT DEPUTIES are no longer present and monitoring him.

71.     Upon information and belief, DEFENDANT DEPUTIES refused to let DANIEL enter his SUV and one of the DEFENDANT DEPUTIES took possession of his car keys so that he was unable to drive anywhere.

72.     DEFENDANT DEPUTIES refused to allow DANIEL to leave the 106 mile marker and, upon information and belief, one or more of the DEFENDANT DEPUTIES used excessive force on him, rendering him physically injured, disoriented and/or confused. The excessive force caused DANIEL to stagger onto I-30 where he was struck by MERCHANT, and killed.

73.     According to reports submitted by HAWTHORN and BIDDLE, HAWTHORN and SOWELL remained at the scene for an indeterminate time with DANIEL after THOMPSON, SULZBERGER and BIDDLE cleared the scene at 5:51 am.

74. DANIEL initially encountered DEFENDANT DEPUTIES, interacting with them for approximately 1.5 hours until DEFENDANT DEPUTIES allegedly left DANIEL, alone, at the scene, six (6) minutes before his violent highway death at approximately 5:57 am.

75. DANIEL was restrained and/or placed in custody by one or more of the DEFENDANT DEPUTIES on January 15, 2022, from approximately 4:35 am until his time of death.

76. DANIEL was restrained and/or placed in custody by one or more of the DEFENDANT DEPUTIES on January 15, 2022, from approximately 4:35 am until approximately 5:51 am.

77. According to SOWELL, he heard on his radio that a vehicle hit a pedestrian in the area where DEFENDANT DEPUTIES interacted with DANIEL minutes earlier. He responded back to the location and claims he "was met by civilian personnel stating that a person had walked out into the travel lanes of the interstate and was struck by several vehicles." He did not provide the identity of the "civilian personnel."

78. SOWELL "attempted to locate the subject and was only able to locate multiple pieces of what appeared to be human remains." He then had other responding units close down that portion of I-30 to prevent further traffic from entering the scene. SOWELL remained on the scene and in the vicinity of potential evidence for traffic control.

### Inexplicable Investigation Irregularities by JARVIS, BRAGG and MCALISTER Compromise Crucial Crime Scene Evidence

79. TCFD Engine 412, including JARVIS and BRAGG, was dispatched to I-30, the scene of DANIEL's death, on January 15, 2022, at 6:00 am. ASP troopers, including MCALISTER, were notified of DANIEL's death at 6:06 am. At 6:10 am, TCFD Engine 412, including JARVIS and BRAGG, arrived at the scene.

19

80.     Only six (6) minutes later, TCFD Engine 412 left the scene of DANIEL's death but

not before power washing the potential crime scene and any evidence located within said potential

crime scene.  See Image No. 10 below.



**Image No. 10: Turtle Creek firefighters power wash the highway portion on
I-30 at the 106 mile marker  where DANIEL was killed**

81.     Despite the reportedly unusual nature of DEFENDANT DEPUTIES' encounter

with DANIEL, and despite the fact that there was a pedestrian highway fatality with multiple

vehicles involved, MCALISTER, the ASP supervisory investigator, did not perform any accident

reconstruction of the impact area, the surrounding areas or vehicles involved.  See Image Nos. 11

and 12 below.



**Image No. 11: 09/26/22 Email inquiring as
to accident reconstruction**



**Image No. 12: 09/26/22 Email response
confirming no accident reconstruction**

82.     During his involvement, MCALISTER took no photographs of Mr. Crenshaw's

vehicle.  He took no photographs of DANIEL's SUV.  He did not create a diagram of DANIEL's

SUV to determine its final resting place subsequent to DEFENDANT DEPUTIES allegedly moving it from the middle of the onramp. MCALISTER did not determine the distance between the location of DANIEL's SUV and the pedestrian-MVA point of impact.

83.     MCALISTER did not even formally interview any of the DEFENDANT DEPUTIES, who were the last persons to see DANIEL alive. After the collision, MCALISTER told Mr. Crenshaw that he should not feel bad about striking DANIEL because DANIEL was a homeless drug addict, which was a knowingly false statement. MCALISTER also told Mr. Crenshaw that DANIEL was a suspected drug trafficker.

84.     MCALISTER never determined what happened to DANIEL's wallet, cell phone, car keys and money box which were lost the morning of January 15, 2022 and have never been recovered.

85.     After leaving the scene, MCALISTER failed to assure the preservation radio call recordings from the January 15, 2022 incident, and ASP now claims missing radio call recording are due to an unexplained communications system malfunction on that date. See Image Nos. 13 and 14 below.



Image No. 13: ASP request for all evidence
From ASP investigation of DANIEL's death

Image No. 14: ASP response reflecting
unexplained lack of ASP radio logs

86.     Conspicuous irregularities plagued MCALISTER's investigation and work product from the very start. For example, instead of referencing "Daniel A. Barajas" in the January 15,

2022 ASP fatal crash reporting form, an unknown 55-year-old presumably Latino man—an Edgar Molina-Santiago of Santa Fe, New Mexico—is inexplicably identified as the person killed on I-30 at the 106 mile marker on the same date as DANIEL. See Image No. 15 below.



**Image No. 15: ASP fatal crash preliminary reporting form purportedly related to the investigation of DANIEL's 01/15/22 highway death**

87.    Thus, MCALISTER's fatal crash report seems to conflate the facts of two (2) separate I-30 interstate incidents into one (1).

### DEFENDANT DEPUTIES Attempt to Impugn DANIEL's Character and Intimidate PLAINTIFF and Her Family from Seeking Answers about His Death

88.    Later in the day on January 15, 2022, Xexilia received a phone call from a one of the DEFENDANT DEPUTIES in which he aggressively questioned her about DANIEL's background. The deputy told Xexilia that contact between DANIEL and officers the morning he died began as a "wellness check" on DANIEL's car. The deputy told her that DANIEL's car was *on the side of the interstate* when they encountered him.

89.    The SCSO deputy then began to pepper Xexilia with questions about DANIEL and drug trafficking even though the deputy had no legitimate basis to conclude DANIEL was a drug trafficker nor any evidence of any drug trafficking history by him. The SCSO deputy tried to make

DANIEL look untruthful, telling Xexilia—who lives in Dallas—that her 630 cell phone area code (Illinois) was inconsistent with DANIEL's statement that his family lived in Texas.

90.     When Xexilia pushed back on this false narrative, the SCSO deputy advised Xexilia of his opinion that DANIEL was a drug trafficker and that is the reason he was detained.  The SCSO deputy told her that just because they did not find any narcotics or contraband on DANIEL's person or in his SUV it did not mean that he was not trafficking drugs.

91.     The SCSO deputy also told Xexilia that prior to his death DANIEL behaved unusually—consistent with a person experiencing hallucinations—which he claimed to interpret as signs of mental illness.  Xexilia asked the deputy for additional details about DANIEL's death but received none.

### DEFENDANT CORONERS Give DANIEL's Family False Information and Lose File Photographs of DANIEL's Body Taken at the Crime Scene

92.     On or about January 17, 2022—two days after DANIEL's death—Xexilia contacted Saline Co. coroner, WEST, seeking information on DANIEL's death and inquiring as to the location of his body.  Xexilia asked WEST to facilitate an autopsy and toxicology testing but WEST refused, telling her that this was impossible due to the state of DANIEL's body.

93.     Specifically, WEST told Xexilia that "there was nothing left of [DANIEL], there is nothing that can be performed on him."  WEST told Xexilia that DEFENDANT CORONERS would not facilitate an autopsy or request a toxicology report.

94.     On or about January 19, 2022, Xexilia contacted WEST again, inquiring as to when her family can claim DANIEL's body.  WEST advised that DANIEL's body was still at the morgue and that DEFENDANT CORONERS were "still doing the process."  Xexilia asked WEST to explain why toxicology testing could not be performed, at a minimum.  WEST provided no response and ended the conversation.

23

95.    On or about January 23, 2022, Xexilia contacted WEST a third time and, before she could ask any questions, he advised her that DEFENDANT CORONERS were "going to go ahead and label [DANIEL's death] a suicide." Xexilia responded that this made no sense, especially given the fact that he was excited to see the newest members of his family.

96.    WEST told Xexilia that the basis for determining DANIEL's manner of death was suicide was premised on the accounts of DEFENDANT DEPUTIES, including their claim that prior to his death, DANIEL tried to walk out on the interstate in their presence, and also that his vehicle was blocking the I-30 entrance ramp at 106 mile marker. WEST explained that DEFENDANT DEPUTIES were out there with DANIEL "for hours." WEST then cut the conversation short, telling Xexilia to direct any further questions about DANIEL's body to the funeral home.

97.    On January 24, 2022, WEST signed off on DANIEL's official death certificate which reflected the manner of DANIEL's death concluded by WEST after his official investigation: "SUICIDE." According to the death certificate prepared by WEST, DANIEL's cause of death was "MULTIPLE SYSTEMS BLUNT FORCE TRAUMA" and the time of death was 6:00 am. The death certificate prepared by WEST erroneously lists a Xexilia's Coppell, Texas address as DANIEL's address.

98.    The only conceivable evidence of suicide as the manner of DANIEL's January 15, 2022 death is SULZBERGER's claim that DANIEL attempted to walk into traffic on I-30 and had to be pulled away from the highway by SULZBERGER and THOMPSON, a seemingly important event to which THOMPSON makes no mention in his official report.

99.    On March 29, 2023, after prior discussions on the matter, CLEGHORN admitted that DEFENDANT CORONERS, apparently through WEST, lost multiple file photographs,

24

including the photographs of DANIEL's body WEST referenced in his report. See Image No. 16 below.



Mr. Kevin Cleghorn
March 29, 2023
Page 2

    As we discussed last week, the recent response of your office to a records request submitted by my office did not include any of Saline Co. Coroner's Office photographs of Mr. Barajas' body taken by Mr. West. It did not include any of the photos Mr. West described in his report. You acknowledged that Mr. West took photos for your office and advised that they were not in your office computer files as you would expect them to be. You could not account for the missing photos and told me you would contact Mr. West to get to the bottom of the matter.

    During our discussion yesterday, you advised me that you reached Mr. West—who is currently working some type of job in Texas—and told him that the photos described in his report were missing from the Saline Co. Coroner's Office investigation file. He told you that he would be back in Arkansas in several weeks, and he would look for them at time. You obtained no further information from Mr. West on the matter.

**Image No. 16: Excerpt from 03/29/23 lawyer memorialization letter to CLEGHORN**

100.    Conspicuous irregularities plagued DEFENDANT CORONERS' involvement and work product in the matter from the start. For instance, WEST falsely advised DANIEL's family that an autopsy was impossible to perform given the condition of his body. WEST told DANIEL's family that a toxicology could not be performed for the same reason, which was also false. Even without regard to the photographs lost or the advice improvidently dispensed, while on the scene on January 15, 2022, WEST took no photographs of DANIEL's car nor the point of impact for the pedestrian-MVA that caused his death.

### DEFENDANT DEPUTIES' Official Reports Regarding their Interactions with DANIEL are Implausible, Contradictory and Contain Glaring Omissions

101.    Neither HAWTHORN and SOWELL's arrival time, nor their presence at the scene, is documented in the SALINE CO. official 911 CAD report, most likely meaning they did not radio in their locations.

102.    However, based on the totality of DEFENDANT DEPUTIES' reports, HAWTHORN and SOWELL were present during the following alleged activities and/or events: DANIEL trying to make jokes with DEFENDANT DEPUTIES; DANIEL exiting the ambulance;

medical personnel speaking with DANIEL; the location of DANIEL's SUV in the middle of the I-30 onramp; deputies assisting DANIEL move his SUV from the onramp; DANIEL's statement that his girlfriend was coming to pick him up; DANIEL blanket clad and walking around on the edge of the roadway; and DANIEL speaking on cell phone outside his SUV.

103.    SOWELL was an eyewitness to DANIEL's actions and demeanor prior to his death but included no description of DANIEL in his single paragraph report.   SOWELL did not take any identifying information from the eyewitness "civilian personnel" from whom he took statements after DANIEL's death.   SOWELL did not draft a report regarding his discussion with the "civilian personnel."

104.    Based on a 01/15/2022 SALINE CO. official 911 CAD report, SCOGGINS was dispatched at 5:08 am, and he arrived "on scene" at 5:08 am.  Based on that same CAD report, a minute later, at 5:09 am, SCOGGINS was again "enroute" to the scene, and again arrived "on scene" at 5:09 am.

105.    Moreover, while on the scene, presumably in close proximity to DANIEL, SCOGGINS made several radio communications that morning at: 5:13 am; 5:19 am; 5:24 am; 5:29 am; 5:34 am; 5:40 am; and 5:47 am.  Based on the CAD report, SCOGGINS then left the scene at 5:51 am, the exact same time as THOMPSON, SULZBERGER and BIDDLE.

106.    SCOGGINS was an eyewitness to DANIEL's actions and demeanor and, despite spending close to forty-five (45) minutes at the scene, and despite making more than a half dozen radio calls from the scene, SCOGGINS did not draft any officer's letter or report of any kind. Despite SCOGGINS' extended presence at the scene—during which time he presumably assisted his colleagues with DANIEL—none of those colleagues mention SCOGGINS in their reports.

107.    Based on various official SCSO reports, HAWTHORN and SOWELL were the last SCSO deputies to see DANIEL alive on January 15, 2022 but there is no official SCSO record or log of the precise time they physically cleared the scene, leaving DANIEL presumably alone.

108.    BIDDLE's supplemental report regarding her K-9 search of DANIEL's SUV makes reference to unknown individuals (apparently named Attaway and Smithee) and two unknown vehicles (one of which is apparently a 2001 Jeep Cherokee) so it is unclear for which vehicle, if any, Cain was actually deployed and which vehicle was actually searched by DEFENDANT DEPUTIES.  See Image No. 17 below.

I placed K9 "Cain" in the sit position near the front driver's corner of the vehicle. I instructed "Cain" to make his way around the vehicle while conducting a free air sniff. During the sniff "Cain" alerted on both driver's and passenger's side doors of Attaways vehicle. I then placed "Cain" in the sit position near the front driver's corner of Smithee's vehicle, 2001 Jeep Cherokee. I instructed "Cain" to begin a free air sniff of the vehicle, to which he alerted to the driver's side front door, passenger's side front door, and passenger's side rear door. The vehicle was searched, with nothing found. Upon opening the passenger's side front door of the vehicle, I

**Image No. 17: Excerpt from BIDDLE's SCSO report purportedly related to her K-9 search of DANIEL's SUV, a white 2005 Nissan Xterra**

109.    SHAMLIN signed off on BIDDLE's report, as well as the reports of all the DEFENDANT DEPUTIES, despite the errors, false statements, references to unknown individuals and material contradictions.

110.    There are no independent reports or documentation related to the alleged K-9 narcotics search performed on DANIEL's SUV by Cain, as directed by BIDDLE, contained in the file for SCSO Incident No. 2022-0157.

111.    Thus, like MCALISTER's fatal error-riddled crash report, BIDDLE's K-9 report that referencing unknowns Attaway and Smithee seems to conflate the facts of two (2) separate I-30 interstate incidents into one (1).

## CONCLUSION

112.    Based on the record, DANIEL did not hallucinate on January 15, 2022 nor did he speak with invisible persons.  DANIEL did not attempt to walk into traffic on I-30 only to be pulled back to safety as SULZBERGER falsely claims.  DANIEL did not commit suicide.

113.    Rather, DANIEL was found to be cognitively and physically intact by EMT personnel whose only objective medical observation—DANIEL's red eyes—was explained by their patient and consistent with eye care documents and ophthalmological equipment in DANIEL's possession at the time.  Something bad happened to DANIEL on I-30 on the morning of January 15, 2022, and only DEFENDANTS know what was.

## COUNT I
## DEFENDANT DEPUTIES
## EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT

114.    PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

115.    DEFENDANT DEPUTIES refused to allow DANIEL to leave the 106 mile marker and, upon information and belief, one or more of the DEFENDANT DEPUTIES used excessive force on him, rendering him physically injured, dazed and/or confused. The excessive force caused DANIEL to become disoriented and stagger onto I-30 where he was struck by MERCHANT and killed.

116.    The violence DEFENDANT DEPUTIES inflicted upon DANIEL was unnecessary, objectively unreasonable and excessive and was, therefore, in violation of his Fourth Amendment Rights.

28

117.    By reason of DEFENDANT DEPUTIES' conduct, DANIEL and his heirs-at-law were deprived of rights, privileges and immunities secured to them by the Fourth and Fourteenth Amendments to the U.S. Constitution, including due process, and laws enacted thereunder.

118.    Therefore, DEFENDANT DEPUTIES are liable to DANIEL and PLAINTIFF in damages pursuant to 42 U.S.C. § 1983, including compensatory damages, costs, attorney's fees and punitive damages.

**COUNT II**
**DEFENDANT DEPUTIES**
**VIOLATION OF THE FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE**
**PER 42 U.S.C. § 1983—SPECIAL RELATIONSHIP/STATE CREATED DANGER**

119.    PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

120.    Generally, an individual has no constitutional right to police protection against harm caused by third parties, including highway dangers.  Accordingly, there is no constitutional duty imposed upon the state or its law enforcement officers that requires them to protect members of the general public, even if those individuals are at high risk for death and/or great bodily harm caused by a third party.

121.    However, there are two (2) well-established exceptions to this general rule: (1) where an individual is injured by a third party while in the custody of a state actor, that state actor may be liable ("special relationship" exception); and (2) where a state actor, through affirmative acts, has either created or increased the risk that an individual will be exposed to private acts of violence and/or serious bodily harm when compared to the risk that existed prior to the affirmative state action ("state-created danger" exception).

122.    In the present case, DEFENDANT DEPUTIES forcibly removed DANIEL from the safety of his SUV which BIDDLE has stated was parked at least partially on the roadway

shoulder and which may have been entirely off the roadway and securely on the righthand shoulder at the 106 mile marker of I-30.

123.    DEFENDANT DEPUTIES refused to allow DANIEL to leave the 106 mile marker and, upon information and belief, one or all of the DEFENDANT DEPUTIES used excessive force on him, rendering him physically injured, dazed and/or confused. The excessive force caused DANIEL to become disoriented and stagger onto I-30 where he was struck by MERCHANT and killed.

124.    Therefore, DEFENDANT DEPUTIES, and each of them, created—or, at least, greatly increased—the risk that DANIEL would be exposed to reasonably foreseeable private acts of violence and/or serious bodily harm including, but not limited to, suffering death or serious bodily injury as a result of being struck by vehicles traveling on I-30.

125.    Pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure, a party may set out two or more statements of a claim alternatively, either in a single count or in separate ones, and when a party avails herself of this pleading device, that party's pleading is sufficient so long as any of the alternative statements is sufficient. See Fed. R. Civ. P. 8(d)(2). Moreover, as reflected in Rule 8(d)(3), a party may state as many separate claims as it has, regardless of consistency. See Fed. R. Civ. P. 8(d)(3).

126.    Schizophrenia is a serious mental illness in which people interpret reality abnormally. According to the DSM-5 (Diagnostic Statistical Manual of Mental Disorders, Fifth Edition), a diagnosis of schizophrenia requires the presence of two of five main symptoms: 1) delusions; 2) hallucinations; 3) disorganized or incoherent speaking; 4) disorganized or unusual movements; and 5) negative symptoms.

30

127. Pleading in the alternative, if DEFENDANT DEPUTIES' stated observations of DANIEL on January 15, 2022 are accurate and truthful, then DANIEL was experiencing a mental health crisis on January 15, 2022 and exhibiting signs of mental illness consistent with schizophrenia. If DEFENDANT DEPUTIES' stated observation of DANIEL are accurate and truthful, then DANIEL was also suicidal on the morning of January 15, 2022.

128. If DANIEL was having a schizophrenic episode or if he was suicidal, then DEFENDANT DEPUTIES had a duty to comply with police policy and protocol regarding the handling of mentally ill persons and suicidal persons in the field when engaging DANIEL.

129. If DANIEL was having a schizophrenic episode or if he was suicidal, not only did DEFENDANT DEPUTIES fail to comply with police policy and protocol regarding the handling of mentally ill persons and suicidal persons in the field but, by forbidding DANIEL from driving and denying him access to his vehicle, DEFENDNANT DEPUTIES made DANIEL less safe than he was prior to their involvement.

130. Therefore, whether by excessive force or by removing a person experiencing a mental health crisis from a place of relative safety, DEFENDANT DEPUTIES created—or, at least, greatly increased—the risk that DANIEL would be exposed to reasonably foreseeable private acts of violence and/or serious bodily injury including, but not limited to, suffering death or great physical harm as a result of being struck by vehicles traveling on I-30.

131. DEFENDANT DEPUTIES were deliberately indifferent insofar as they acted with recklessness despite the dangerous circumstances so obvious that they knew or should have known that it subjected DANIEL to unreasonably increased risk of death or serious bodily injury.

132. DEFENDANT DEPUTIES' actions were unnecessary, objectively unreasonable and deliberately indifferent, and said actions caused DANIEL's death. Therefore, DEFENDANT

31

DEPUTIES are liable to PLAINTIFF in damages pursuant to 42 U.S.C. § 1983, including compensatory damages, costs, attorney's fees and punitive damages.

**COUNT III**
**THOMPSON AND SULZBERGER**
**RACIAL PROFILING IN VIOLATION OF THE FOURTEENTH AMENDMENT'S**
**EQUAL PROTECTION CLAUSE PER 42 U.S.C. § 1983—RACIAL PROFILING**

133.    PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

134.    Police officers do not owe a duty of protection to individuals. However, where the state discriminates in providing protection to members of the public; those situations violate the equal protection clause of the Fourteenth Amendment. The equal protection clause operates to bar discrimination or disparate treatment based on classifications that are not rationally related to a legitimate government purpose.

135.    Equal protection rights are violated when (1) a person is a member of an identifiable class; (2) that person is intentionally treated differently from others similarly situated; and (3) there is no rational basis for the difference in treatment. Discriminatory intent implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker selected or reaffirmed a particular course of action at least in part because of–not merely in spite of–its adverse effects upon an identifiable group.

136.    It is well settled that the equal protection clause is applicable not only to discriminatory legislative action, but also to discriminatory governmental action in administration and enforcement of the law.

137.    State officials and sheriff's deputies are under an affirmative duty to preserve law and order, and to protect the personal safety of persons in the community.

138.    Police action is subject to the equal protection clause and Section 1983 whether in the form of commission of violative acts or omission to perform required acts pursuant to the police officer's duty to protect.

139.    It is clearly established law that the police may not discriminate on the basis of race, nationality or ethnicity.  The state may not selectively target certain disfavored minorities without violating the Equal Protection Clause.

140.    DANIEL was a member of an identifiable group.  As pled above, he was a Latino motorist traveling on a federal interstate, and PLAINTIFF alleges DANIEL was treated differently on account of his race, nationality and/or ethnicity without a rational basis for said different treatment.  PLAINTIFF further alleges that THOMPSON and SULZBERGER each acted with discriminatory intent in:

> a)  racially profiling DANIEL because of his Latino heritage;
>
> b)  restraining him and ordering him not to drive despite the fact the DANIEL violated no law and was physically able to drive;
>
> c)  taking possession of DANIEL's car keys;
>
> d)  committing excessive force against him; and
>
> e)  failing to protect DANIEL.

141.    An individual who alleges that a police officer intentionally treated him differently than other similarly situated individuals and alleges that there was no rational basis for the difference in treatment, states a viable Fourteenth Amendment Equal Protection Claim, be it race or nationality.

142.    THOMPSON and SULZBERGER's affirmative acts were pursuant to a custom, pattern and/or practice of racial profiling racial and ethnic minorities—including Latinos—SCSO deputies encounter on the highways.

143.    This pattern of police misconduct was so pervasive as to constitute a "custom or usage" with the force of law. This practice is tantamount to an administrative classification used to implement the law in a discriminatory fashion. There is no rational basis for this disparate treatment.

144.    The actions taken by THOMPSON and SULZBERGER have violated DANIEL's rights as guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, in that he, as a minority highway motorist of Latino descent, has been afforded less favorable terms and conditions then others similarly situated on the basis of his race, nationality or ethnicity, which is impermissible.

145.    DEFENDANTS' actions were unnecessary, objectively unreasonable and deliberately indifferent. Therefore, they are liable to DANIEL and PLAINTIFF in damages pursuant to 42 U.S.C. § 1983, including compensatory damages, costs, attorney's fees and punitive damages.

**COUNT IV**
**SALINE CO. AND RODNEY WRIGHT**
***MONELL* AND SUPERVISORY LIABILITY**

146.    PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

147.    A *Monell* "custom" is defined as a practice of municipal officials that is not authorized by written law, but which is so permanent and well-settled as to have the force of law. At all relevant times, including in January 2022 and prior thereto, there existed an unconstitutional *Monell* municipal "custom" at SCSO whereby SCSO sheriffs, including WRIGHT, knowingly allowed his deputies to racially profile non-white motorists despite the fact that such a custom constitutes a continuing violation the Fourth Amendment.

148.    At all relevant times, over the course of many years, there existed an unconstitutional official policy and/or unconstitutional *Monell* custom at SCSO whereby:

      a)  Latinos and other minorities and non-whites are racially profiled on federal highways and local roads; and

      b)  Latinos and other minorities and non-whites are detained without cause during traffic stops and "wellness checks."

149.    The allowance of this pattern was the result of deliberate indifference to fact that SCSO's official policies and/or customs were in violation of the Fourth Amendment and would naturally result in the violation of the constitutional rights of highway motorists traveling in Arkansas, including DANIEL.

150.    The official policy and/or *Monell* "custom" described above was the moving force behind the violations of DANIEL's constitutional rights and proximately caused his constitutional injuries and death.  The official policy and/or *Monell* "custom" described above also proximately caused a deprivation of the rights, privileges and immunities secured to DANIEL by the Fourth and Fourteenth Amendments to the U.S. Constitution, and laws enacted thereunder.

151.    The custom described above was the moving force behind the violations of DANIEL's constitutional rights committed by WRIGHT and SALINE CO. and proximately caused his personal injuries, great pain and other damages.  The custom described above also proximately caused a deprivation of the rights, privileges and immunities secured to DANIEL by the Fourth and Fourteenth Amendments to the U.S. Constitution, including due process, and laws enacted thereunder.

152.    As a result of the official policies and/or customs described above, PLAINTIFF's Fourth Amendment rights were violated. Therefore, WRIGHT and SALINE CO. are liable to

PLAINTIFFS in damages under 42 U.S.C. § 1983, including, loss of liberty interest, punitive damages and attorney fees.

### COUNT V
### DEFENDANT DEPUTIES, DEFENDANT CORONERS, WRIGHT, JARVIS, BRAGG AND MCALISTER
### CIVIL CONSPIRACY PER 42 U.S.C. § 1983

153.    PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

154.    To prove a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must show: (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff.

155.    DEFENDANT DEPUTIES, DEFENDANT CORONERS, WRIGHT, JARVIS, BRAGG and MCALISTER conspired among themselves and others to deprive DANIEL of his constitutional rights. DEFENDANT DEPUTIES, DEFENDANT CORONERS AND WRIGHT, and others, engaged in multiple over acts in furtherance of the conspiracy alleged herein and these overt acts caused injury to PLAINTIFF, including but not limited to conspiring to conceal the true nature of DEFENDANT DEPUTIES traffic stop of DANIEL.

156.    By reason of the conduct of DEFENDANT DEPUTIES, DEFENDANT CORONERS, WRIGHT, JARVIS, BRAGG and MCALISTER, DANIEL was deprived of rights, privileges and immunities secured to him by the Fourth and Fourteenth Amendments to the U.S. Constitution, and laws enacted thereunder.

157.    The acts committed by DEFENDANT DEPUTIES, DEFENDANT CORONERS, WRIGHT, JARVIS, BRAGG and MCALISTER was unnecessary, objectively unreasonable and excessive and were, therefore, in violation of DANIEL's Fourth and Fourteenth Amendment

Rights. Therefore, DEFENDANT DEPUTIES, DEFENDANT CORONERS, WRIGHT, JARVIS, BRAGG and MCALISTER are liable to DANIEL and PLAINTIFF in damages pursuant to 42 U.S.C. § 1983, including compensatory damages, costs, attorney's fees and punitive damages.

**COUNT VI**
**JARVIS, BRAGG AND MCALISTER**
**VIOLATION OF SIXTH AMENDMENT RIGHT TO ACCESS COURTS**

158.   PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

159.   The First and Fourteenth Amendments protect the rights of individuals, such as PLAINTIFF, to seek redress for claims that have a reasonable basis in law and fact. Efforts by state actors to impede an individual's access to courts or administrative agencies can provide the basis for a constitutional claim under 42 U.S.C. § 1983.

160.   Judicial access must be adequate, effective and meaningful and therefore, when police officers conceal or obscure important facts about a crime from its victims rendering hollow the right to seek redress, constitutional rights are abridged.

161.   Litigants in cases alleging a denial of the constitutional right of access to the courts of this type must allege that there are specific cases that cannot now be tried (or tried with all material evidence) as a result of a defendant's conduct. The official acts claimed to have denied access may allegedly have caused the loss or inadequate settlement of a meritorious case or the loss of an opportunity to seek some particular order of relief.

162.   Here, JARVIS, BRAGG and MCALISTER fraudulently concealed the facts which would have given rise to a civil lawsuit against the assailant(s), whomever they might be, if they are ever identified. Therefore, the Commonwealth three (3) year statute of limitations for filing

civil lawsuit based on battery and assault in the current action expired on April 29, 2011, at the very latest.

163.     DANIEL is unable to provide an account of what happened on January 15, 2022, and PLAINTIFF was not present at the time of his death.  Therefore, PLAINTIFF depended upon and relied upon MCALISTER to use his skills, ASP technology and ASP policy dictates to determine if criminal or civil prosecutions were available to PLAINTIFF, or if other individuals were involved in causing DANIEL's death.

164.     MCALISTER either engaged in specific conduct or assisted DEFENDANTS in engaging in conduct and concealing conduct.  The misconduct committed by MCALISTER was unnecessary and unreasonable, and caused PLAINTIFF significant injury.  MCALISTER's acts were not taken in good faith but, rather, in bad faith.

165.     By reason of the conduct of MCALISTER, PLAINTIFF was deprived of rights, privileges and immunities secured to her by the First and Fourteenth Amendments to the United States Constitution, and laws enacted thereunder.

166.     The acts of MCALISTER were unnecessary, objectively unreasonable and malicious.  Therefore, MCALISTER is liable to PLAINTIFF in damages pursuant to 42 U.S.C. § 1983, including compensatory damages, costs, attorney's fees and punitive damages.

### COUNT VII
### CHEEMA CARRIERS
### NEGLIGENCE

167.     PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

168.     On January 15, 2022, MERCHANT was operating CHEEMA CARRIER's semi-tractor trailer (VIN 1FUJHHDR4LLKS3741), under the authority of U.S. Department of

Transportation No. 2427301, on an open and public highway, within the course and scope of his employment with CHEEMA CARRIERS, when he struck DANIEL, causing his death.

169.   MERCHANT owed a legal duty to DANIEL and the traveling public in general to exercise the highest degree of care which means that degree of care that a careful and prudent person would use under the same or similar circumstances

170.   At the aforesaid time and place, CHEEMA CARRIERS, by and through its employee, servant and/or agent MERCHANT, was guilty of one or more of the following negligent acts or omissions:

   a) Operated a vehicle at a speed in excess of the speed limit;

   b) Operated a vehicle at an unreasonable speed in light of the weather and lighting conditions;

   c) Operated a vehicle at a speed greater than was reasonable and proper with regard to the traffic conditions;

   d) Failed to keep a proper look-out;

   e) Failed to appropriately reduce speed;

   f) Failed to make necessary allowances for operating a heavily loaded truck;

   g) Failed to drive with proper care and attention in an area known by him to be dangerous;

   h) Allowed himself to become distracted such that he failed to properly observe and respond to the circumstances ahead of him on the roadway;

   i) Failed to operate his vehicle in accordance with generally accepted safety principles and practices of the trucking industry;

   j) Failed to maintain control of his vehicle;

   k) Operated his vehicle while fatigued to the point of being a less safe driver;

l)  Failed to drive defensively;

m)  Operated a motor vehicle while texting, talking on a cellphone
and/or otherwise unreasonably distracted; and

n)  Failed to exercise the degree of caution that a reasonable person
under similar circumstances would have exercised in the
operation of a commercial motor vehicle.

o)  Failed to make necessary allowances for operating a heavily
loaded truck; and

p)  Failed to drive with proper care and attention in an area known
by him to be dangerous;

171.    As a result of the collision, DANIEL was caused to sustain significant physical

injuries, with accompanying pain and suffering, loss of normal life and disfigurement; to incur

medical expenses; and to experience loss of income.

**COUNT VIII**
**DEFENDANT DEPUTIES FOR WRONGFUL DEATH**
**ARKANSAS CODE ANNOTATED § 16-62-102(a) and (b)**

172.    PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set

forth again in this paragraph.

173.    On January 15, 2022, DEFENDANT DEPUTIES, and each of them, owed those

with whom they professionally interacted, such as DANIEL, a duty of due care which is the duty

to act reasonably in the circumstances.

174.    For law enforcement officers, such as DEFENDANT DEPUTIES, that duty of due

care encompasses the duty to reasonably assess circumstances and make reasonable deductions in

the field expected of a reasonably competent, reasonably well-trained law enforcement officer,

such as identifying factors which lead a reasonable mind to suspect a person is suffering from

mental illness and/or in the midst of a mental health crisis.

175.    For law enforcement officers, such as DEFENDANT DEPUTIES, that duty of care encompasses the duty to maintain public order and to enforce at all times all such laws, ordinances and regulations for the preservation of good order and the public welfare, including the duty to follow all such laws, ordinances and regulations.

176.    Disregarding those duties, DEFENDANT DEPUTIES were guilty of one more of the following acts which proximately caused DANIEL's death:

a)  committing excessive force against DANIEL;

b)  negligently and/or intentionally ignoring and disregarding information and/or indications the reasonable appreciation of which would have prevented DANIEL's death, such as information regarding his mental illness and indications that he was having a mental health crisis;

c)  unreasonably restricting DANIEL's personal freedom and right to travel;

d)  unreasonably seizing DANIEL's personal property; and

e)  being otherwise negligent, neglectful and unreasonable in their interactions with DANIEL's and others on the scene.

177.    By reason of the wrongful death of DANIEL, DANIEL and his heirs-at-law have incurred pecuniary damages, emotional distress and severe mental anguish.

178.    PLAINTIFF brings Count VIII pursuant to Ark. Code Ann. § 16-62-102(a) and (b) which provides for damages whenever the death of a person shall be caused by a wrongful act notwithstanding the death of the person.

## COUNT IX
## DEFENDANT DEPUTIES FOR SURVIVAL PURSUANT TO
## ARKANSAS CODE ANNOTATED § 16-62-101(a)(1)

179.    PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

180.    On January 15, 2022, prior to his death, DANIEL suffered personal injuries and great pain proximately caused by the wrongful acts and/or omissions of DEFENDANT DEPUTIES, including but not limited to, committing excessive force on DANIEL, proximately causing his death.

181.    By reason of the wrongful acts and/or omissions of DEFENDANT DEPUTIES, and each of them, DANIEL incurred personal injuries and great pain as well as damages in the form of loss of life.

182.    PLAINTIFF brings Count IX pursuant to Ark. Code Ann. § 16-62-101(a)(1) which provides for damages for wrongs done to a person and further provides that such an action may be brought after the death of the person by his executor.

WHEREFORE, Plaintiff, MARIA ELENA BARAJAS, Administrator of the Estate of DANIEL ADRIAN BARAJAS, deceased, by and through her attorneys, and requests judgment against DEFENDANTS, and each of them:

1. That DEFENDANTS be required to pay PLAINTIFF's compensatory damages;

2. That DEFENDANTS be required to pay actual damages;

3. That the individual defendants be required to pay punitive damages; and

4. That DEFENDANTS be required to pay attorney fees per 42 U.S.C. § 1988; and

5. That PLAINTIFF receive any other such relief as this Honorable Court deems just and proper, including declaratory and injunctive relief.

Respectfully submitted,

Michael J. Laux

Michael J. Laux
E. Dist. Arkansas Bar No. 6278834
One of the Attorneys for PLAINTIFF
LAUX LAW GROUP
400 W. Capitol Avenue, Suite 1700
Little Rock, AR 72201
Telephone: (501) 242-0750
Facsimile: (501) 372-3482
E-mail: mlaux@lauxlawgroup.com
        mikelaux@icloud.com

and

David W. Ransin
One of the Attorneys for PLAINTIFF
RANSIN INJURY LAW
4045 East Sunshine, Suite 100
Springfield, MO 68509
Telephone: (417) 881-8282
Facsimile: (417) 881-4217
Email: david@ransin.com

**4B-306. Letters of administration (*no will*).**
[For use with Rule 1B-304 NMRA]

STATE OF NEW MEXICO
IN THE PROBATE COURT
<u>BERNALILLO</u>    COUNTY

IN THE MATTER OF THE ESTATE OF
<u>DANIEL ADRIAN BARAJAS</u>, DECEASED.

ENDORSED
FILED IN MY OFFICE THIS

JUN 1 0 2022
LINDA STOVER

COUNTY CLERK

No. **20220717**

## LETTERS OF ADMINISTRATION
### (*NO WILL*)

TO WHOM IT MAY CONCERN:

Notice is now given that    <u>MARIA ELENA BARAJAS</u>    (*name of personal representative*) has been appointed to serve as the personal representative of the estate of    <u>DANIEL ADRIAN BARAJAS</u>    , and has qualified as the personal representative of the estate of the decedent by filing with the court a statement of acceptance of the duties of that office.

The personal representative has all of the powers and authorities provided by law and specifically, by Section 45-3-715 NMSA 1978.

Issued this <u>10</u> day of    <u>June</u>    , <u>2022</u>.
LINDA STOVER

Clerk of the Probate Court

By: _____
Deputy Clerk

(*Seal*)

## USE NOTE

*See* NMSA 1978, Section 45-3-103 and NMSA 1978, Section 45-3-601 for issuance of letters.
[Approved, effective September 15, 2000; as amended by Supreme Court Order No. 07-8300-005, effective March 1, 2007; 4B-106 recompiled and amended as 4B-306 by Supreme Court Order No. 18-8300-014, effective for all cases pending or filed on or after December 31, 2018.]

**Exhibit A**